In re Abraham D. SOFAER, Respondent.

No. 97–BG–1096.

District of Columbia Court of Appeals.

Argued April 29, 1998.

Decided April 22, 1999.

Samuel Dash, with whom David B. Isbell, Washington, DC, Robert J. Sisk, New York City and M. Kathleen O'Connor, Washington, DC, were on the brief, for respondent.

Leonard H. Becker, Bar Counsel, with whom Michael S. Frisch, Senior Assistant Bar Counsel, was on the brief, for Bar Counsel.

Edwin D. Williamson, filed a brief as amicus curiae on behalf of respondent.

Before FARRELL and RUIZ, Associate Judges, and KING,* Senior Judge.

FARRELL, Associate Judge:

This case is before us on exceptions to the report and order of the Board on Professional Responsibility (the "Board") directing Bar Counsel to issue an informal admonition to respondent for having violated Rule 1.11(a) of the District of. Columbia Rules of Professional Conduct. The rule states in relevant part:

> A lawyer shall not accept other employment in connection with a matter which is the same as, or substantially related to, a matter in which the lawyer participated personally and substantially as a public officer or employee.

A hearing committee and the Board both concluded that respondent had violated this rule by undertaking to represent the government of Libya in connection with criminal and civil disputes and litigation arising from the 1988 bombing of Pan American Flight 103 over Lockerbie, Scotland, after respondent, while serving as Legal Advisor in the United States Department of State, took part personally and substantially in the government's investigation of the bombing and in related diplomatic and legal activities.

■ We sustain the Board's order and adopt its comprehensive report, which sets forth (and in turn adopts) the hearing com-

---

* Judge King was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on November 23, 1998.

mittee's findings of fact,[1] correctly explains the elements of a Rule 1.11(a) violation, and demonstrates why Bar Counsel proved by clear and convincing evidence that respondent violated the Rule. We limit ourselves to the following discussion, which presupposes familiarity with the Board's report, annexed hereto.

▮ 1. Respondent argues that in defining the "matter" in which he took part while Legal Advisor as "the legal activities flowing from the government's efforts to address [the Pan Am 103 bombing]," the Board bundled together activities so diverse in nature as to give him no fair warning of a potential overlap when he accepted the private representation of Libya. We are not persuaded. The activities in question, including diplomatic intervention with an unnamed country, attendance at confidential briefings on the criminal investigation, and overseeing the State Department's response to civil third-party subpoenas, all centered about a distinct historical event involving specific parties,[2] whether or not all had been identified. As the Board recognized, "The 'matter' is not terrorism, or even Libyan terrorism"; rather, "[t]he core of fact at the heart of each piece of legal activity is ... why and how Pan Am 103 blew up over Lockerbie." The contours of the bombing and the government's investigation and related responses to it were defined sharply enough to constitute a "matter" under the Rule.

2. Respondent contends that his work as Legal Advisor concerned the Pan Am 103 bombing in ways that were too marginal, infrequent, or passive to amount to "personal and substantial" participation in the matter. The main feature of the government's response, he asserts, was the criminal investigation conducted by the Department of Justice, not the Department of State; State's

role (hence respondent's) consisted largely of a routine response to a third-party subpoena issued by Pan Am[3] in furtherance of its theory that the U.S. government had advance warning of the bombing but failed to act.

Respondent's discounting of the subpoena as routine depends partly on hindsight: the district court eventually quashed the subpoena. Until then, however, the subpoena had the potential of embroiling the government in the tort litigation, and so respondent's role in reviewing and approving the memorandum recommending the State Department's response to the subpoena cannot be considered perfunctory. But his participation went further. After Pan Am voiced its theory of government foreknowledge at a meeting with the Secretary of State which respondent either attended or knew of, respondent's judgment was sought on whether, or how fully, to inform the Department's designated witness in the subpoena matter of the meeting, in preparation for his testimony. That action, as Bar Counsel points out, did not become "insubstantial" because the legal judgment was easily arrived at or because the government subsequently concluded that Pan Am's theory of government complicity was unsupported.

Moreover, respondent's actions take on added significance when viewed in the context of his participation, as one of a small number of senior State Department officials, in confidential oral and written briefings which periodically included information about the progress of the criminal investigation and related diplomatic actions. The fact that respondent played no role in the investigation itself and was not shown to have recommended or taken action based on the briefings[4] is not critical. As the Board explained,

---

1. This court must accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record. D.C. Bar R. XI, § 9(g) (1998). The Board, in turn, must accept the hearing committee's factual findings if similarly supported. *See, e.g., In re Micheel,* 610 A.2d 231, 234 (D.C.1992).

2. *See* Rule 1.11(a), comment [3] (" 'Matter' ... encompass[es] only matters that are particular to a specific party or parties.").

3. The subpoena was issued in the mass tort litigation brought against Pan Am by relatives of the Pan Am 103 victims.

4. An apparent exception was respondent's participation, occasioned by the Pan Am 103 bombing, in a diplomatic exchange with an unnamed country intended to persuade the country to abate terrorist activity.

"Respondent was much more than the passive recipient of general agency information. As chief legal officer of the State Department, [he] was kept abreast of the progress of the investigation and the diplomatic efforts in response to the bombing precisely so that he could provide legal advice and perform legal duties concerning the bombing when called upon to do so."

■ All told, respondent's active participation in the Pan Am 103 matter bears no resemblance to the merely peripheral or formal involvement in a matter which the Rule does not encompass. *See* Opinion No. 84, D.C. Bar Legal Ethics Committee (1980) (interpreting former DR 9–101).

■ Respondent's assertion that by emphasizing his receipt of confidential information from the briefings the Board confused Rule 1.11(a) with Rule 1.6 (restricting use of client confidences or secrets) is mistaken. While he is correct that "no one has ever suggested any improper disclosure of confidences by Respondent," Rule 1.11(a) bars participation in overlapping government and private matters where "it is reasonable to infer counsel may have received information during the first representation that might be useful to the second"; "the 'actual receipt of ... information,' " and hence disclosure of it, is immaterial. *Brown v. District of Columbia Bd. of Zoning Adjustment,* 486 A.2d 37, 50 (D.C.1984) (en banc) (citations omitted).

■ 3. Rule 1.11(a) prohibits a lawyer from accepting employment in connection with a matter "the same as, or substantially related to," a matter in which he or she took part as a public officer or employee. The

inquiry is a practical one asking whether the two matters substantially overlap.[5] Respondent insists that he stayed clear of that overlap by restricting the terms of his agreement to represent Libya so as to "assum[e] Libya's culpability for the [Pan Am 103] bombing." A lawyer may, of course, limit the objectives of a representation with client consent. Rule 1.2(c). But respondent's retainer agreement exemplifies why, in our view, limiting the private representation rarely will succeed in avoiding the convergence addressed by Rule 1.11(a). While stating that "[the firm's] efforts will not include substantial activities as litigators but rather would be limited to activities associated with agreed upon measures, including consensual dispositions," the agreement emphasized that "[m]easures will be taken only with your [*i.e.,* Libya's] prior consent, and *without admission of liability*" (emphasis added). The proposed activities included "investigating the facts and legal proceedings, preparing legal analyses, providing legal advice and proposing legal steps to deal with" the "ongoing civil and criminal disputes and litigation" stemming from the destruction of Pan Am 103—all clearly features of a comprehensive attorney-client relationship. We do not question the sincerity of respondent's belief that the representation could be insulated, factually and ethically, from the investigation and diplomatic efforts of which he had been part. The "substantially related" test by its terms, however, is meant to induce a former government lawyer considering a representation to err well on the side of caution. Respondent did not do so.[6]

5. As the Board explained, Rule 1.11(a) carries forward the test and methodology for determining whether matters are "substantially related" set forth in *Brown, supra. See* Rule 1.11(a), comment [4]. *Brown* "broadened the scope of the 'substantially related' test" over that applicable to side-switching in the private sphere. 486 A.2d at 50. At the same time, the Board recognized that we deal in this case with attorney discipline and not (as in *Brown*) a conflict of interest issue arising from a civil dispute. Thus, the Board was careful to view respondent's conduct, including the "substantial" overlap of the two matters, from the perspective of Bar Counsel's obligation to prove an ethical violation by clear and convincing evidence.

6. Our holding in *Brown, supra,* that the several transactions at issue in that case were not substantially related, hence were not the same "matter," comports with our conclusion here. That holding, although ultimately a "legal conclusion ... for this court to make," 486 A.2d at 54, rested critically upon findings of fact by the administrative agency negating any overlap between the earlier zoning matters and the later one. *Id.* at 52–58. Here, in contrast, the hearing committee made factual findings fully supporting our conclusion that respondent's representation of Libya was substantially related to his involvement as Legal Advisor in the post-bombing governmental actions.

4. Respondent points to the exact words "accept other employment" in the Rule and makes an argument which neither the Board nor the hearing committee addressed. To conclude that he had accepted employment on behalf of Libya, he maintains, the Board had to find "that [his] conditional agreement to represent Libya was capable of being legally carried out," which required that the firm obtain the necessary OFAC authorization [7] for the representation—a critical part of which was not received before he and his firm withdrew from the representation. Bar Counsel counters that the reason neither the Board nor the hearing committee considered this argument is that it was not raised until now and thus has been waived. *See, e.g., In re James*, 452 A.2d 163, 168 (D.C.1982). We have examined all of respondent's arguments to the hearing committee and the Board and can, indeed, find none directed to "what constitutes 'accept[ing] other employment' " (Br. for Resp. at 38). His arguments instead focused entirely upon the meaning and application of the terms "matter," "substantially related," and "participated personally and substantially." We thus would be well within our authority to disregard the present argument.

■ In any event, we reject it on the merits. Respondent did not just conditionally *agree* to represent Libya—the representation actually began after four things took place: OFAC issued a specific license authorizing respondent's firm to receive fees and expenses in connection with the pending criminal and civil cases affecting Libya; the firm received a letter of credit from Bank Credit Suisse for $2.5 million, ensuring payment of Libya's legal fees; the firm issued a press release announcing the representation and its receipt of the license from OFAC; and the firm received the first $250,000 installment of the legal fees. Thereafter, respondent and the firm performed the services summarized in paragraph 52 of the Board's report which included, but were not limited to, resolving continued differences with OFAC as to the correct license needed to carry on the representation. In these circumstances, it would be a wholly artificial reading of the Rule to say that respondent had not "accept[ed the] employment" before withdrawing from it two weeks later for reasons unrelated to OFAC permission.[8]

5. Joined by *amici curiae* who are former government officials, respondent urges that finding an ethical violation in this case will deter District of Columbia lawyers from entering the government or serving for long once there, lest Rule 1.11(a) trip them up after they enter private practice. We are sensitive to the concern, already voiced in *Brown, supra*, that over-zealous application of the revolving-door rule would be "at the cost of creating an insular, permanent legal bureaucracy." 486 A.2d at 47. But that concern is misplaced here. Our finding that respondent violated Rule 1.11(a) is well within the heartland of Rule 1.11(a)'s application. Further, Bar Counsel aptly states *why no lawyer need find himself inadvertently in the position of risk* that respondent and amicus hypothesize:

> A former government lawyer in the Respondent's position is free to solicit the views of his or her former agency concerning the proposed private legal undertaking (which the Respondent deliberately elected not to do in this case), or to consult with ethics advisers in his or her law firm (which, again, the Respondent seems not to have done concerning Rule 1.11) or with the Legal Ethics Committee of the Bar (which the Respondent never suggested he did). If, while in government service or while contemplating entry into such service, the attorney deliberates the prospect that Rule 1.11 will narrow somewhat the career choices and client selections available to the attorney following departure from the government, then the Rule will have served one of its salutary objectives.

■ We affirm the Board's conclusion that respondent violated Rule 1.11(a) and the

---

7. OFAC is the government agency that administers economic sanctions imposed on foreign countries by the United States, including sanctions imposed on Libya in 1986.

8. The fact that respondent's representation of Libya lasted so briefly is a separate consideration which, we agree with the Board, went to the issue of appropriate sanction, not violation.

Board's order directing Bar Counsel to issue an informal admonition.

*So ordered.*

APPENDIX.

DISTRICT OF COLUMBIA COURT OF APPEALS BOARD ON PROFESSIONAL RESPONSIBILITY

In the Matter of:
ABRAHAM D. SOFAER, ESQUIRE,
Respondent.

Bar Docket No. 280–93

*ORDER OF THE BOARD ON PROFESSIONAL RESPONSIBILITY*

### I. INTRODUCTION

On December 21, 1988, Pan American Flight 103 was blown up over Lockerbie, Scotland, killing everyone on board and 11 people in the town below. The United States undertook an intensive investigation to identify the perpetrators of this terrorist act, and the families of the victims sued Pan Am for damages arising from the bombing. At the time of the bombing and the beginning of the investigation, Respondent was the Legal Adviser in the United States Department of State. In June 1990, Respondent left the State Department to join the Washington office of the law firm of Hughes Hubbard & Reed (HH & R). In November 1991, two Libyans were indicted by a federal grand jury for the bombing.

In July 1993, Respondent and HH & R were retained to represent Libya in connection with criminal and civil disputes and litigation arising from the Pan Am ·103 bombing. Respondent intended to seek consensual monetary settlements with the families of the victims and negotiate arrangements by which Libya would surrender the two indicted Libyans for trial by the United States and the United Kingdom in a mutually agreeable venue. In mid-July 1993, soon after Respondent's retention by Libya became public, he and HH & R withdrew from the representation,

stating that the adverse public and governmental reaction made it impossible to accomplish the purposes for which they were retained.

Shortly thereafter, Bar Counsel initiated an investigation into Respondent's possible violation of District of Columbia Rule of Professional Conduct 1.11(a). This rule prohibits a former government lawyer from representing a party in connection with a matter that is the same as or substantially related to a matter in which the former government lawyer participated personally and substantially while working in the government. On July 25, 1995, Bar Counsel charged Respondent with violating this rule.

Hearing Committee Number One conducted an evidentiary hearing on December 5 and 6, 1995.[1] The Hearing Committee concluded, over the dissent of the public member, that Respondent's representation of Libya constituted a violation of Rule 1.11(a). The Committee recommended that Respondent receive an informal admonition for his misconduct. The Hearing Committee found that "[m]ost of the facts in this case are not in dispute." Hearing Committee Report at 5. What is hotly contested before the Board on Respondent's exception to the Hearing Committee's Report is whether these facts prove a violation of Rule 1.11(a). While our analysis does not follow precisely the same path as the Hearing Committee's, it reaches the same conclusion. We adopt the Hearing Committee's very thorough Findings of Fact virtually without change.

### II. FINDINGS OF FACT

1. Respondent is a member of the District of Columbia Bar, having been admitted on November 22, 1989.

#### A. The Tripoli Bombing

2. Respondent served as the State Department's Legal Adviser from June 1985 to June 15, 1990. In this position, he was the State Department's chief legal counselor and supervised the activities of the State Depart-

---

1. "BX" refers to Bar Counsel's Exhibits at the evidentiary hearing; "RX" to Respondent's Exhibits; "I Tr." to the transcript of the hearing before the Hearing Committee on December 5, 1995; and "II Tr." to the transcript of the hearing on December 6, 1995.

ment's Office of the Legal Adviser. Respondent and the other attorneys in his office provided legal advice to the Secretary of State and to other officials in the State Department and the United States government.

3. While Respondent was the Legal Adviser, the United States government was grappling with the appropriate response to certain acts of terrorism connected to the Libyan government. These acts included the December 1985 bombings and terrorist attacks of the Rome, Italy, and Vienna, Austria airports. Respondent met periodically with a high-level, interagency group of lawyers to consider legal issues related to the possible use of force against Libya in retaliation for its sponsorship of these terrorist acts. Other lawyers in this group included the Counsel to the President, the Legal Adviser to the National Security Council, the General Counsel of the Central Intelligence Agency, the General Counsel of the Department of Defense, the Legal Counsel to the Chair of the Joint Chiefs of Staff, and the Assistant Attorney General for the Office of Legal Counsel in the Department of Justice.

4. On April 5, 1986, a bomb exploded in a discotheque in Berlin, Germany, killing several United States military personnel. The United States government learned that this bombing was also connected to the Libyan government. As a result, the United States decided to take retaliatory action against Libya. Respondent met with the interagency group of high-level government lawyers to provide legal advice to administration officials on the sufficiency of the evidence linking Libya to the Berlin discotheque bombing, the necessity for the use of force against Libya, the proportionality of the proposed response, and the applicability of the War Powers Resolution to the proposed retaliation.

5. While participating in these discussions, Respondent learned details of communication intercepts linking the Berlin discotheque bombing to Libya. He also learned about passports seized from the Abu–Nidal terrorists who had committed the Rome and Vienna airport bombings, which also connected the terrorists to the Libyan government.

Respondent was informed of other possible acts of terrorism that Libya was planning. Finally, Respondent was informed about potential Libyan targets that the United States was considering bombing.

6. On April 15, 1986, the United States government bombed Tripoli, the capital of Libya.

7. Much of the classified information that Respondent learned before the Tripoli bombing about Libyan terrorism was publicly disclosed by the United States government after the bombing. Respondent was not sure in his testimony at the hearing in this matter if all the information he learned was disclosed. He testified that he thought that all of the significant information, but not the way the intelligence was gathered, was made public. II Tr. 18–19, 40–41; RX 6; RX 74. Respondent himself published an article, cleared by United States government authorities, concerning Libya's terrorist activities. RX 7.

### B. The Pan Am 103 Bombing

8. On December 21, 1988, Pan Am Flight 103, en route from London, England to New York, New York, was blown apart over Lockerbie, Scotland by a plastic explosive hidden in a radio cassette player placed inside a suitcase on the flight. All 289 persons on board and 11 persons in Lockerbie were killed.

#### 1. The Investigation

9. The Pan Am 103 bombing sparked a massive hunt by the United States and the United Kingdom for the perpetrators of this heinous act. As the State Department's Legal Adviser, Respondent received the State Department's daily written briefing report about sensitive or important matters. This classified report was provided to approximately 25 top officials in the State Department. The report periodically contained information about the progress of the United States government's investigation concerning the bombing, which was ongoing during the remainder of Respondent's State Department service. I Tr. 191, 206–07; II Tr. 95–96, 115–16; BX 40; BX 42. Respondent also received oral briefings about matters of in-

terest in the State Department. These briefings were provided by State Department Bureau of Intelligence and Research officials to top State Department officials, including the Secretary of State, the Deputy Secretary, Under–Secretaries, a number of Assistant Secretaries, and the Legal Adviser. Respondent testified that these oral briefings "from time to time" included information about the progress of the Pan Am 103 investigation. II Tr. 42–44, 87–88; BX 40 at 2; BX 42. Between the time of the Pan Am 103 bombing and his departure from the State Department, Respondent also had access to classified communications and cables relating to the progress of the investigation and diplomatic efforts concerning the bombing. BX 25; BX 37; BX 39 at 4. The documents to which he had access remain classified, and Respondent did not have a specific recollection of their exact content beyond information that was published in newspapers at the time of the investigation.

10. While Respondent was the Legal Adviser, the United States government's investigation into the Pan Am 103 bombing focused not on Libya but on two other countries. The United States initially believed the chief suspects in the bombing were the Iranian Revolutionary Guard Corps in Iran or the Popular Front for the Liberation of Palestine in Syria, or both. Iran and Syria were also suspected of supporting these terrorist groups in committing the bombing. Iran was suspected partly because a United States Navy ship had shot down an Iran civilian aircraft over the Gulf of Iran in 1988. I Tr. 207–08; II Tr. 32–33; RX 12. In the classified briefings Respondent received as the Legal Adviser, he was informed of the evidentiary basis for suspecting that one or both of these two entities, and Iran or Syria, had sponsored the Pan Am 103 bombing. II Tr. 46–48, 54–55; II Tr. 205–07; BX 37; BX 39 at 4; RX 61.

11. Sometime after the Pan Am 103 bombing, Respondent participated in a diplomatic exchange with a country other than Libya, "occasioned by the Pan Am 103 bombing," relating to that country's responsibility for terrorist activity generally. BX 39 at 4. Respondent communicated directly with that country to persuade it to stop its terrorist activities. The details of that exchange, including the country involved, remain classified and were not disclosed at the hearing.

### 2. The Pan Am 103 Civil Litigation and Non–Party Subpoenas

12. In 1989, families of the victims of the Pan Am 103 bombing filed wrongful death lawsuits against Pan Am and other defendants in several federal courts. In April 1989, the federal Judicial Panel on Multidistrict Litigation consolidated for pretrial purposes the federal lawsuits into one proceeding, *In re Air Disaster at Lockerbie, Scotland,* before the United States District Court for the Eastern District of New York (Platt, J.) (hereafter "the Civil Case").

13. On September 27, 1989, Pan Am served non-party subpoenas on the State Department and five other government agencies, seeking documents and the identification of knowledgeable witnesses relating to a theory by Pan Am that the United States government had advance warning of the Pan Am 103 bombing but failed to take adequate steps to prevent it. BX 1; BX 2; BX 3; RX 13.

14. On November 21, 1989, the Justice Department, which represented government agencies on subpoena matters such as this, moved to quash the subpoenas because of its on-going criminal investigation into the bombing. On December 29, 1989, the Justice Department wrote to all six agencies asking for their positions on the disclosure of their documents responsive to the subpoenas. BX 1. The letter pointed out that the Justice Department would respond to the subpoenas on behalf of all six agencies. The letter stated that the Justice Department wanted the agencies' position on disclosure under their "administrative or housekeeping regulations." The letter also noted that all the agencies believed that Pan Am's allegations were unfounded. *Id.*

15. On January 31, 1990, the Justice Department again wrote to the six agencies, providing a report on the status of its motion to quash the subpoenas and describing in

detail Pan Am's theory of United States government liability for the bombing. The substance of Pan Am's theory, as described in this letter, was that the United States government, through the CIA, received several specific warnings in the days just before the Pan Am 103 bombing about plans for an explosive to be placed on a Pan Am flight. Allegedly, some of the warnings and tips identified as the target of the attack the specific Pan Am 103 flight that was bombed. BX 2.

16. An attorney in the State Department's Office of the Legal Adviser drafted a memorandum recommending the State Department's response to the subpoena. The draft memorandum was to be transmitted from Respondent, as the Legal Adviser, and Mr. Busby, as the head of the State Department's Office on Counterterrorism, to Edward Perkins, the State Department's Director General, who responds to such subpoenas on behalf of the State Department. The memorandum noted that a search of State Department files revealed approximately 400 documents responsive to Pan Am's request, but many of these documents originated with other agencies and would have to be referred to these agencies for their position on release. The memorandum stated that approximately half of the documents were classified and therefore could not be released under the "state secrets" privilege. ·The memorandum also reported that the Justice Department would ask for the documents to be withheld if it determined that their production would prejudice the criminal investigation. Finally, the memorandum recommended that Frank Moss, an official in the State Department's Office on Counterterrorism, should be designated as the appropriate State Department witness to testify on the events described in the responsive documents. Attached to the memorandum were the Pan Am subpoena and the letters from the Justice Department concerning the subpoena, but the responsive documents were not attached.

17. Respondent read the memorandum, dated January 31, 1990, and its attachments. He did not believe that he saw any of the documents that were responsive to the subpoena. After reviewing the memorandum and attachments, Respondent approved the memorandum by initialing it. The memorandum was also signed by Mr. Busby's deputy on his behalf and sent to Mr. Perkins. I Tr. 33–34, 39–40, 194–95; II Tr. 49; BX 3; BX 41 at ¶ 5.

18. Both Bar Counsel and Respondent advanced much testimony at the hearing relating to whether Respondent's review and approval of this memorandum was, as Respondent claimed, routine and unimportant or, as Bar Counsel argued, substantial and significant. Respondent testified that because he believed Pan Am's allegations were meritless, he did not give much consideration to the contents of the memorandum. He testified that he considered the memorandum to be a routine response to a subpoena request for documents. II Tr. 124–25. He also testified that, as Legal Adviser, he approved "a couple of dozen" memoranda per year dealing with State Department responses to subpoenas, and he perfunctorily approved this one as well. Id.; II Tr. 106.

19. Bar Counsel provided evidence, however, that Respondent had instituted a policy that all documents from his office going to an Assistant Secretary or higher official in the State Department had to be reviewed by him, and this memorandum fit into that category. I Tr. 197–98; II Tr. 105–06; BX 41 at ¶ 5; RX 64 at ¶ 12. Respondent enforced this policy because he wanted to be aware of and involved in advice given by his office to higher-level officials in the State Department. II Tr. 176–80. Respondent also admitted that on rare occasions, he returned a memorandum to his staff when he disagreed with its contents. II Tr. 106. Moreover, while Respondent may have approved dozens of documents dealing with the State Department's responses to subpoenas, this response was lengthier, related to a more complicated third party case, involved more documents than normal, concerned sensitive intelligence matters, and related to a criminal investigation being pursued by the Department of Justice. II Tr. 157, 173–76. Therefore, the Hearing Committee concluded that "Respon-

dent's review and signing of this memorandum constituted the exercise of his discretion to approve the legal advice in the memorandum and was not an insignificant or ministerial act." Hearing Committee Report at 13.

### 3. The Meeting with Pan Am and the Busby Consultation

20. In the fall of 1989 a meeting was held among Secretary of State James Baker, Mr. Busby, and Thomas Plaskett, the Chief Executive Officer of Pan Am. Respondent testified that he did not know whether he attended the meeting, although he knew he was informed about the meeting by Mr. Busby. I Tr. 202–04. *But see* II Tr. 111 ("I did recall the Pan Am theory and I did recall being in a meeting"); BX 39 at 5 ("I do recall, and may have attended [the Baker/Plaskett meeting]"); BX 41 at ¶ 2 ("I did recollect having attended a meeting with representatives of Pan Am"). The purpose of the meeting was for Mr. Plaskett to apprise the Secretary of State about the allegation, discussed above, that the United States government may have had advance warning of the Pan Am 103 bombing and therefore shared some culpability for it. Respondent was also informed after the meeting that the United States government investigated the allegations raised by Pan Am and believed them to be meritless.

21. When the State Department received Pan Am's non-party subpoena, Mr. Busby asked Respondent if Frank Moss, the State Department official who was designated as the State Department's knowledgeable witness in response to the subpoena, should also be informed about the information in the State Department's possession concerning Pan Am's theories and the Baker/Plaskett meeting. Mr. Busby had told only a limited number of government officials about the substance of the Baker/Plaskett meeting because of the sensitivity of the subject and the on-going investigation into the bombing. But by January 1990, Pan Am's theory had been discounted by the United States government. Respondent learned that the State Department and other government agencies had investigated Pan Am's contentions and

believed them to be baseless. Respondent testified that he did not think it would do any harm to notify Mr. Moss about the substance of the Baker/Plaskett meeting. Respondent therefore advised Mr. Busby that Mr. Moss should be informed of the discussions at the meeting.

### 4. Subsequent Events in the Pan Am 103 Investigation and Litigation

#### a. Attention Focuses on Libya

22. Sometime during June 1990, the United States government uncovered information linking Libya to the Pan Am 103 bombing. Investigators determined that the bomb that destroyed Pan Am 103 was activated by a sophisticated electronic timer that had been delivered to Libyan intelligence officials. This timer was identical to other timers used by Libyan terrorists who had been captured in 1988. Therefore, in June 1990, the United States government began to focus its investigation on Libya.

23. The evidence at the hearing indicates that Respondent did not learn of the new information linking Libya to the Pan Am 103 bombing while he was the Legal Adviser. He left the State Department to join HH & R on June 15, 1990. Although it is unclear exactly when in June 1990 the United States learned of the new evidence pointing to Libya, the Hearing Committee found that "Respondent testified forcefully and credibly that he did not know about it while at the State Department. He said he learned about the evidence in November 1991, after he had left the State Department, when the indictment of two Libyans for the bombing was announced." Hearing Committee Report at 16. Respondent's testimony was supported by an article he wrote for *The Washington Post* in July 1990, which suggested that Iran was responsible for the Pan Am 103 bombing. RX 9.

#### b. The Civil Case

24. On December 12, 1990, the United Stated District Court overseeing the Pan Am 103 Civil Case granted the Justice Department's motion to quash Pan Am's non-party subpoenas, including the subpoena to the

State Department that was the subject of Respondent's January 31, 1990, memorandum. Pan Am then filed a motion for leave to implead the United States as a third-party defendant. On December 17, 1990, the United States opposed Pan Am's motion, and on April 24, 1992, the court rejected Pan Am's attempt to implead the United States and refused to permit an action to proceed against the United States. On July 10, 1992, after an eleven-week jury trial, the plaintiffs in the Civil Case won a judgment holding that Pan Am had engaged in willful misconduct that was a substantial factor in causing the bombing. The amount of the damages was not decided. *See In re Air Disaster at Lockerbie, Scotland,* 811 F.Supp. 89, 90 (E.D.N.Y.1993). Subsequently, damages were decided for three passenger plaintiffs. *Id.*

### c. The Criminal Case

25. As noted above, on November 13, 1991, the United States indicted two Libyans for planting the bomb that destroyed Pan Am 103. The indictments were returned in the United States District Court for the District of Columbia (*United States v. Ali Al Megrahi*) (hereafter, the "Criminal Case").

26. On November 24, 1991, the United States and the United Kingdom proposed a joint declaration for United Nations approval, calling for the Libyan government to surrender the two indicted Libyans for trial, to disclose all it knew about the bombing, and to pay appropriate compensation for the bombing. On January 21, 1992, the United Nations Security Council adopted a resolution condemning the bombing and urging Libya to cooperate fully in establishing responsibility for the bombing. On March 31, 1992, because Libya did not respond to the United Nations demand, the United Nations called for the imposition of sanctions on Libya.

### C. Respondent and HH & R Seek to Represent Libya

27. On June 15, 1990, Respondent left the State Department to become a partner in the Washington office of HH & R.

### 1. Negotiations with Libya

28. In late 1992, Graham Wisner, a Washington, D.C. lawyer who knew Respondent, asked Respondent if he was interested in assisting Wisner in representing Libya in connection with legal proceedings in the United States arising from the Pan Am 103 bombing. Respondent replied that he would not defend Libya for anything it had done, but if Libya was looking for a way to satisfy its obligations under the United Nations resolutions, he would be interested in representing Libya for that purpose. I Tr. 210–13.

29. Wisner told Respondent that the Libyans were interested in having Respondent write a proposal concerning his potential representation of Libya. I Tr. 218. Respondent drafted a letter, dated January 7, 1993, proposing a representation of Libya "in connection with on-going civil and criminal disputes and litigation relating to the destruction of Pan Am 103." BX 7 at 1; I Tr. 218. The letter, addressed "To Whom it May Concern," stated that HH & R was prepared to assist "in resolving by consensual negotiations all pending and potential civil and criminal litigations and other legal proceedings" relating to the Pan Am 103 bombing. BX 7 at 1. HH & R proposed to commence work on this representation when Libya placed a retainer of $3 million into HH & R's escrow account in a Swiss bank, payable to HH & R for its work at the rate of $250,000 a month. *Id.*

30. Respondent delivered this proposal to Wisner, who gave it to "intermediaries" of the Libyan government. I Tr. 218. Respondent also met twice with representatives of the Libyan government in Geneva to discuss the proposed representation. I Tr. 219, 250–51; II Tr. 97–98.

### 2. The Representation Agreement

31. On April 14, 1993, Respondent and a representative of the Libyan government signed two letters, similar in terms to the January 7 letter, that established the agreement by which Respondent and HH & R would represent Libya in connection with civil and criminal litigation relating to the Pan Am 103 bombing. The letters were

addressed to "The Committee for the Case of Lockerbie." This committee acted on behalf of the Libyan government and consisted of the Libyan Ambassador to Morocco, the Libyan Ambassador to Tunisia, the Libyan Minister of Foreign Affairs, and the Libyan Chief of Foreign Security. RX 4; BX 10; II Tr. 78–81.

32. The terms of the April 14 representation agreement specified that HH & R:

would represent you [sic] committee in connection with on-going civil and criminal disputes and litigation relating to the destruction of Pan Am 103.... We are prepared to assist the relevant parties regarding the above incident by investigating the facts and legal proceedings, preparing legal analyses, providing legal advice and proposing legal steps to deal with this matter. Our efforts will not include substantial activities as litigators but rather would be limited to activities associated with agreed upon measures, including consensual dispositions. Measures will be taken only with your prior consent, and without admission of liability.

BX 10 at 1. The letter went on to point out that "[o]ur firm has excellent litigators, including former prosecutors, former State officials, and lawyers familiar with aircraft litigation, upon all of whose talents we would draw as necessary." *Id.* at 2. The agreement also stated that HH & R was unwilling to engage in any activities that would require it to register under the Foreign Agents Registration Act (FARA). *Id.* at 1. This meant that HH & R would limit its activities to legal work rather than any lobbying on behalf of Libya.

33. The financial terms of the agreement specified that Libya would deposit a $3 million retainer into a mutually agreeable Swiss bank account for one year's work by HH & R. The retainer would be disbursed to HH & R at the rate of $250,000 a month. The representation would begin when the Libyans provided a letter of credit to HH & R's Swiss bank account ensuring payment of the agreed-upon fees and when HH & R confirmed that it had obtained a license from the Treasury Department's Office of Foreign Assets Control (OFAC) permitting HH & R to receive payments from Libya legally. *Id.;* I Tr. 219–20.

34. Respondent testified that the two specific objectives of the representation were: 1) to attempt to resolve the extradition request for the two indicted Libyans in a manner acceptable to the United States, the United Kingdom, and the Libyan government; and 2) to seek consensual settlements of the civil litigation arising from the Pan Am 103 bombing in a manner satisfactory to the plaintiffs, their counsel, the court, and the Libyans. I Tr. 213–19; BX 12A; BX 27. Another lawyer at HH & R, Mr. Gerson, described Respondent's contemplated role as "Kissingerian"—achieving a "grand scale" settlement providing compensation to families of the victims in fulfillment of the United Nations resolutions.

35. Respondent testified that "acting as Libya's lawyer" he intended to work out an arrangement with the Department of Justice to have the two indicted Libyans produced to an acceptable venue for trial. I Tr. 217; II Tr. 62–63. Respondent thought that the Libyans, the United States, and the United Kingdom might agree that the trial of the Libyans could proceed in a forum other than the United States, such as Scotland. II Tr. 62–63; II Tr. 261. Respondent stated that he specifically declined to represent the two indicted Libyans in the defense of their criminal case or to represent Libya in defending itself in connection with the bombing. I Tr. 93–95, 217–18; BX 27.

36. Respondent also testified that he contemplated Libya making an *ex gratia* payment to the families of the victims of the bombing, that is, a payment by Libya without any admission of fault. I Tr. 214–18; II Tr. 63–64. While Respondent was Legal Adviser, he had successfully obtained *ex gratia* payments from Iraq for the families of the servicemen killed or injured on the *USS Stark,* a United States Navy ship that had been attacked by an Iraqi aircraft. I Tr. 183–85; RX 74 at ¶ 5. Respondent described the *ex gratia* payment by Iraq in the Stark case:

You accept the responsibility to pay for the damage without saying that you were lia-

ble in a tech—you know, like Iraq did in Stark. Iraq said this was a mistake, we didn't—we wouldn't be—we wouldn't be responsible, *if you had a trial, you wouldn't be able to find us responsible, but we're paying you anyway;* accept responsibility in that sense at least, yes.

I Tr. 214 (emphasis added).

37. Respondent had in mind a figure of $1 billion as an appropriate *ex gratia* payment from Libya for the Pan Am 103 bombing. II Tr. 63–64. Although Libya was not a party to the Civil Case, Respondent thought that the Civil Case could be a "possible vehicle" for making payments to the families of the victims. II Tr. 64–65. Respondent also knew that Pan Am would seek damages from Libya from the proposed *ex gratia* payment, but Respondent was not contemplating that Libya would agree to make any such payment to Pan Am. II Tr. 64.

### D. *Preparations to Represent Libya*

#### 1. *The OFAC License*

38. In preparation for their representation of Libya, Respondent and HH & R took several steps. First, they attempted to obtain the required OFAC license. OFAC administers the economic sanctions imposed on foreign countries by the United States, including 1986 sanctions on Libya. Under those sanctions, any economic transaction with Libya was prohibited unless OFAC granted a specific license to engage in the transaction or the transaction was authorized by a general license because it fit within a general category of acceptable transactions. Providing legal advice to Libya on the United States legal system was covered by a general license. Receiving payments from Libya for legal services required a specific license.

39. On March 11, 1993, an attorney at HH & R spoke to Richard Newcomb, the director of OFAC, regarding HH & R's possible representation of Libya. Newcomb stated that "lobbying" to settle the Civil Case would not fall within OFAC's general exception for legal services. Because the exact scope of HH & R's Libyan representation

was not clear at the time, Newcomb suggested that HH & R provide a written description of what it intended to do for Libya. BX 8.

40. On April 19, 1993, after Respondent and the Libyan representative signed the representation agreements described in paragraphs 31–33 above, an HH & R attorney advised OFAC in writing that HH & R would be providing "[l]egal representation to the Government of Libya in connection with [the Criminal Case and the Civil Case]." BX 11. Respondent and HH & R believed that it could provide such legal services under a general license, but that they needed a specific license to be paid by Libya for their services. HH & R's letter therefore requested a specific license for receipt of payments from Libya for legal services. BX 11.

41. On May 10, 1993, OFAC issued a specific license to HH & R to receive payments of fees and expenses in connection with the Criminal Case, the Civil Case, and any other United States court cases relevant to the Pan Am 103 litigation. OFAC also required HH & R to file a copy of the specific license with "the court." BX 12.

#### 2. *Ethical Issues Facing HH & R*

##### a. *Mr. Gerson Withdraws From HH & R*

42. Respondent and HH & R were aware of an ethical issue related to their proposed representation of Libya because another attorney at HH & R, Allan Gerson, represented a plaintiff who was seeking compensation from Libya for the Pan Am 103 bombing. I Tr. 237–39. Mr. Gerson, a law professor on leave from his university, had been working at HH & R in an "of counsel" capacity since January 1991. On July 1, 1992, Mr. Gerson had written an article in *The New York Times* proposing adoption of a United Nations resolution establishing an international claims commission to administer compensation by Libya for the families of the Pan Am 103 victims. As a result of his article, two men whose relatives were killed in the bombing, Bruce Smith and Paul Hudson, retained Mr. Gerson and HH & R to seek compensation from Libya through the establishment of the United Nations commission. By early

1993, Mr. Gerson began contemplating suing Libya in the United Kingdom on behalf of his clients.

43. On January 4, 1993, Respondent told Mr. Gerson that Respondent and HH & R were considering representing Libya in connection with the Pan Am 103 bombing. Respondent informed Mr. Gerson that they should not discuss Mr. Gerson's representation of the Pan Am 103 plaintiffs because Mr. Gerson "might be on the other side" if Respondent were retained by Libya. I Tr. 111–12. Respondent believed that it would have been an ethical conflict for him and HH & R to represent Libya with regard to payment of compensation to the relatives of the victims while at the same time another HH & R lawyer was considering a lawsuit against Libya on behalf of the relatives of the victims. I Tr. 237–38; BX 39 at 2. Charles Scherer, the managing partner of HH & R, agreed that this situation raised a conflict under the District of Columbia ethics rules. II Tr. 235–36.

44. On March 24, 1993, Mr. Scherer and Robert Sisk, the chairman and senior litigating partner of HH & R, informed Mr. Gerson that an ethical conflict was developing because of HH & R's impending representation of Libya. Mr. Scherer testified that Mr. Gerson was told that he would have to leave HH & R if it were retained by Libya. II Tr. 235. Mr. Gerson testified that he understood that if the firm agreed to represent Libya, he would either have to withdraw from representing the Pan Am plaintiffs or leave the firm.

45. On April 16, 1993, after the representation agreements between Libya and HH & R were signed, Mr. Gerson wrote a letter to HH & R announcing his intention to withdraw from his position with the firm and return to teaching full-time. BX 10A. This letter confirmed that Mr. Gerson was continuing his representation of Mr. Smith, one of the Pan Am plaintiffs; Mr. Gerson no longer represented the other plaintiff, Mr. Hudson. Mr. Smith subsequently signed a letter terminating any relationship between himself and HH & R, confirming that he wanted to be represented by Mr. Gerson, and consenting to HH & R's representation of Libya. RX 35.

### b. Rule of Professional Conduct 1.11(a)

46. John Townsend, the managing partner of the Washington office of HH & R, assisted in HH & R's preparations to represent Libya. HH & R had a firm-wide ethics committee, and a Washington HH & R partner, Bill Stein, was a member of that committee. Mr. Townsend consulted with Mr. Stein concerning the ethical rules applicable to HH & R's proposed representation of Libya. According to Mr. Townsend, sometime after HH & R and Respondent agreed in April 1993 to represent Libya, Respondent asked Mr. Townsend for a copy of any ethics rule applicable to the proposed representation. Mr. Townsend consulted with Mr. Stein, who said that Respondent should keep in mind Rule 1.11 as well as Rule 1.9.[2] Respondent was given a copy of both rules. II Tr. 252–59.

47. Respondent testified at the hearing that he did not specifically recall discussing Rule 1.11 with Mr. Townsend, Mr. Stein, or anyone outside the firm to determine whether this rule prevented Respondent from representing Libya. Respondent said, however, that the issue "certainly came up." II Tr. 116–22, 268–70. He testified that he consulted with members of the firm about the ethics issues surrounding the proposed representation of Libya, but he did not "systematically" address whether his prior service as the Legal Adviser precluded his representation of Libya under Rule 1.11. Respondent testified that much more important to him was the question whether he had learned any "confidential information" as Legal Adviser that might have to be revealed during his representation of Libya, and because he believed he had not learned such information, he "thought [Rule 1.11] was clearly inapplicable" to his representation of Libya. II Tr. 109, 118–21. Respondent said he did not think that Rule 1.11 was "a major issue" or a "real

2. Rule of Professional Conduct 1.9 prohibits a lawyer who formerly represented a client in a matter from representing another person in the same or a substantially related matter if the person's interests are materially adverse to the former client, unless the former client consents.

issue" concerning his proposed representation. II Tr. 120–21.

48. Respondent did not consult with the State Department before undertaking the Libyan representation to determine if it had any objection to his representing Libya. He also did not check with the State Department to determine whether he had worked on any matters while in the government that arguably could be considered substantially related to his representation of Libya. II Tr. 83. Respondent said he refrained from doing so before the representation began because he knew his representation of Libya would create a "bombshell," and he was not confident that Libya would follow through with its intent to hire him. Libya had courted other lawyers in the past but had not retained them. Moreover, according to Respondent, he believed that the limitation he placed on the scope of the representation—seeking consensual resolutions only and not helping Libya avoid liability—made everything he learned at the State Department irrelevant, since he was proceeding on the assumption that Libya was responsible for the bombing.

49. HH & R did take action to "wall off" Peter Flory, a law clerk at the firm, from any involvement in the Libyan representation. From January 1992 to January 1993, Flory had served as the Associate Coordinator in the State Department's Office on Counterterrorism. This office helped coordinate the work of federal agencies, including the FBI and the Justice Department, in connection with counterterrorism issues worldwide. According to Mr. Flory, the Office on Counterterrorism was the lead office in developing United States policy with regard to the bombing of Pan Am 103. During the time Mr. Flory worked in that office, he was involved in deliberations regarding the Pan Am 103 bombing, working directly in support of the development and implementation of U.S. diplomatic and other policy with regard to Libya's sponsorship of the attack. Because Mr. Flory had been privy to classified and confidential information connecting Libya to the bombing, HH & R decided he should not be involved in the firm's representation of Libya. According to Mr. Townsend,

the managing partner of HH & R's Washington office, he asked Mr. Flory to send a letter to the State Department confirming that he would not be involved in HH & R's representation of Libya "so that there would be no question of concern at State that any classified information that was lurking in Peter [Flory's] mind was being applied to this representation." II Tr. 257–58.

### E. The Representation of Libya Begins

50. On June 24, 1993, HH & R received a letter of credit from Bank Credit Suisse for $2.5 million, ensuring payment of Libya's legal fees. BX 14. On June 30, 1993, HH & R sent a statement billing Libya $250,000 for professional "services and advice" to be performed by Respondent and HH & R for Libya during the month of July 1993. BX 15.

51. On July 1, 1993, HH & R received $250,000 in its Geneva bank account from Libya. Respondent and HH & R considered its representation of Libya to begin on July 1.

52. Respondent and HH & R took several initial steps as part of its representation of Libya. Various research projects were assigned to HH & R attorneys, such as compiling docket entries in the Pan Am 103 Civil Case, collecting reported decisions arising from litigation relating to the bombing, surveying United States practice regarding trials of international fugitives, surveying relevant treaties between the United States and Libya, and researching procedures for filing an OFAC license with a court. Respondent and other HH & R lawyers also met to discuss possible approaches to the resolution of the Criminal and Civil Cases. In addition, Respondent wrote to a member of the Libyan committee to request relevant documents from Libya.

53. Although HH & R had obtained a specific license from OFAC to receive payments for its legal services, there was still some question whether HH & R's contemplated legal representation exceeded the services permitted under OFAC's general license. Moreover, HH & R was concerned about having to file the specific license with the court overseeing the Civil Case, as re-

quired by the license. Libya was not a named party in the Civil Case, and HH & R thought that filing the specific license with the court might be construed as waiving the sovereign immunity of Libya from a lawsuit in the United States. As a result, on July 1, 1993, HH & R wrote to OFAC requesting a meeting to discuss the terms of the OFAC license. BX 16.

54. On July 12, 1993, HH & R issued a press release announcing that it had "been retained by the Government of Libya to assist it in seeking a consensual resolution of litigation arising from the Pan Am 103 disaster." BX 19. The release quoted Respondent as stating: "This retention does not mean that Libya or either individual defendant has decided to appear in the criminal or civil cases. Hughes Hubbard & Reed will advise the Government of Libya with a view to developing solutions for the differences which exist in these litigations, and which are acceptable to all parties; we will not litigate actively in defense of Libya or the individual defendants." *Id.*

55. The release provoked extremely negative public reaction, including an editorial on July 14 in *The Washington Post* comparing Respondent's representation of Libya to the movie "Indecent Proposal." BX 20; BX 24. On July 14, in response to media inquiries, a State Department spokesperson stated that the State Department would not comment on whether Respondent's representation of Libya created a conflict of interest.

56. On July 15, 1993, Respondent and another HH & R lawyer met with the Director of OFAC and other OFAC officials. The OFAC officials advised Respondent that a general OFAC license permitted HH & R to provide Libya with legal advice and to represent Libya concerning potential extradition of the two indicted Libyans. Because Libya was not a party to any proceeding in the United States, the general license did not permit HH & R to pursue settlement negotiations on behalf of Libya. A specific license was needed for that purpose. Respondent testified that he stated at the meeting that he intended to contact the lawyer representing the families of the victims about the possibili-

ty of commencing settlement negotiations, and if that process looked like it was going to proceed, he would apply for another specific license as required by OFAC. On July 15, 1993, Respondent wrote to a lawyer for the Pan Am plaintiffs to describe Respondent's role in representing Libya.

57. Also on July 15, 1993, Respondent wrote to the State Department's Legal Adviser, Conrad Harper, expressing displeasure with the statement attributed to the State Department official concerning Respondent's representation of Libya. Respondent's letter to Mr. Harper described the proposed scope of his and HH & R's representation of Libya and stated that Respondent did not see any legal or ethical impediment to it. The letter asked for the State Department's appraisal of this position. BX 25. Later that day, after his meeting with OFAC officials, Respondent wrote to Mr. Harper again to clarify the nature of HH & R's representation of Libya and to ask for a prompt reply about the propriety of the representation. BX 27.

### F. Respondent and HH & R Withdraw from Representing Libya

58. On July 16, 1993, Respondent and HH & R withdrew from representing Libya. They issued a press release announcing the withdrawal and stating that the public perception of HH & R's undertaking and the reaction of government authorities were so negative that HH & R concluded that it could not effectively carry out the representation. Respondent testified that the public reaction and the inaccurate portrayal that HH & R was trying "to get Libya off the hook" had caused the families of the victims to react unfavorably. In addition to the families' reaction, a hostile response from United States government officials, including Senators and State Department officials, made Respondent and HH & R conclude they could not reach consensual resolutions of the Civil and Criminal Cases and therefore should withdraw. Respondent stated that he and HH & R withdrew because "we didn't think we'd be able to do the job effectively." II Tr. 122.

59. HH & R subsequently applied to OFAC for a specific license to return the $250,000 payment it had received from Libya

for services rendered during July 1993. That license was granted, and HH & R returned the $250,000 to Libya.

### G. Investigations into Respondent's Conduct

60. In response to a request from United States Senator Carl Levin, the Office of Government Ethics (OGE) reviewed whether Respondent's conduct violated any applicable post-employment restrictions on government employees, including 18 U.S.C. § 207. This statute prohibits a former federal government employee from communicating or appearing before a federal government agency, with the intent to influence the government, in connection with a particular matter in which the former official participated personally and substantially when in the government. OGE concluded that because Respondent had not yet contacted any government officials with the intent to influence them in connection with his Libyan representation, he had not violated this statute. OGE made no judgment on the hypothetical question whether Respondent would have violated the law if he had continued the representation and made substantive communications to executive branch officials on behalf of Libya. BX 46.

61. The United States Attorney's Office for the District of Columbia also investigated the circumstances surrounding HH & R's application for an OFAC license but closed its investigation without bringing any charges.

62. On July 22, 1993, as a result of his review of press articles about Respondent's representation of Libya, Bar Counsel began an investigation into Respondent's conduct. Bar Counsel sent Respondent a letter asking for his response to the allegation that his representation of Libya may have violated the District of Columbia Rules of Professional Conduct, particularly Rule 1.11(a).

63. In response to these investigations, on August 18, 1993, Respondent's counsel sent to the State Department a draft of two paragraphs describing Respondent's recollection of the matters on which he worked while the Legal Adviser that related to the Pan Am 103 bombing. Respondent's counsel asked whether these recollections were accurate. BX 37. According to this submission, Respondent recalled his diplomatic exchange with the country other than Libya and recalled that he either attended or knew about the Baker/Plaskett meeting. *Id.* On August 20, 1993, the State Department's Legal Adviser, Mr. Harper, responded that the State Department was not in a position to verify the accuracy of Respondent's submission. Mr. Harper noted, however, that Respondent had signed the January 31, 1990, memorandum concerning the State Department's response to Pan Am's non-party subpoena. BX 38. Respondent testified that he had forgotten about that memorandum until Mr. Harper's letter reminded him of it. I Tr. 198–99; II Tr. 110–11; BX 41.

### H. The Disciplinary Proceedings

64. Bar Counsel and Respondent agreed to a diversion agreement in April 1995, which was rejected by the Board Chair on May 1, 1995. Respondent rejected an informal admonition offered by Bar Counsel, so Bar Counsel petitioned the matter and brought it to a hearing.

65. Hearing Committee Number One held a two-day evidentiary hearing on December 5 and 6, 1995. Bar Counsel and Respondent were given the opportunity to submit briefs, and to address specific legal issues posed by the Committee concerning the interpretation of Rule 1.11(a).

66. In a Report and Recommendation dated October 22, 1996, Hearing Committee One concluded after a thorough analysis of the facts and the law that "Respondent did participate personally and substantially while at the State Department in the response to the Pan Am 103 bombing, including the government's investigation and the establishment of liability for it. [The Committee further] conclude[d] that this matter was substantially related to his later representation of Libya and therefore Respondent violated Rule 1.11(a)." Hearing Committee Report at 51. The Committee recommended an informal admonition as the ap-

propriate sanction for Respondent's misconduct. Hearing Committee Report at 70–72.

67. The public member of Hearing Committee One dissented, because she disagreed that Respondent obtained confidential information in his capacity as Legal Adviser that could have been useful in his subsequent representation of Libya, given the limits on Respondent's representation and the lack of any real doubt by July 1, 1993 as to whether Libya was responsible for the Pan Am 103 tragedy.

68. This matter is before the Board on Respondent's exception to the Hearing Committee's Report and Recommendation.

### III. DISCUSSION CONCERNING VIOLATION

A. *Conduct Prohibited by Rule 1.11(a).*

Rule 1.11(a) states in pertinent part:

A lawyer shall not accept other employment in connection with a matter which is the same as, or substantially related to, a matter in which the lawyer participated personally and substantially as a public officer or employee.

Therefore, the essential elements to show a violation of Rule 1.11(a) are:

(1)  a government lawyer

(a) participates as a public employee in a matter,

(b) both personally and substantially;

(2)  followed by the lawyer's leaving the government and accepting employment in another matter that is

(a) the same as, or

(b) substantially related to the original matter.

We outline first the definitions and case authority available to us in construing the Rule. We then apply these provisions to Respondent's conduct, taking into account the arguments made by Respondent and Bar Counsel.

1.  *What is a "matter" for purposes of Rule 1.11(a)?*

The definition of "matter" for purposes of Rule 1.11(a) is crucial for an analysis of whether any "matter" in which Respondent participated as Legal Adviser is the same as, or substantially related to, the representation of Libya he undertook at HH & R. At all times relevant to Respondent's conduct,[3] Rule 1.11(g) defined "matter" as: "[A]ny judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, investigation, charge, accusation, arrest, or other particular matter involving a specific party or parties." Comment [3] to Rule 1.11 explains that "[t]he making of rules of general applicability and the establishment of general policy will ordinarily not be a 'matter' within the meaning of Rule 1.11."

The District of Columbia Court of Appeals has not been presented with a case requiring interpretation of the word "matter" in the context of Rule 1.11(a) since the Rules became effective on January 1, 1991. The leading case interpreting predecessor DR 9–101(b), *Brown v. District of Columbia Zoning Adjustment*, 486 A.2d 37 (D.C.1984)(*en banc*), noted with approval the characterization of "matter" by the American Bar Association's Committee on Professional Ethics and Grievances, which described a matter as " 'a discrete and isolatable transaction *or set of transactions* between identifiable parties.' " 486 A.2d at 42 n. 4 (emphasis in original), quoting *Committee for Washington's Riverfront Parks v. Thompson*, 451 A.2d 1177, 1188 (D.C.1982). In *Committee for Washington's Riverfront Parks*, 451 A.2d at 1188, the Court quoted at length the description of "matter" by the ABA Committee:

Although a precise definition of "matter" as used in the Disciplinary Rule is difficult to formulate, the term seems to contemplate a discrete and isolatable transaction or set of transactions between identifiable parties. Perhaps the scope of the term "matter" may be indicated by examples. The same lawsuit or litigation is the same

---

**3.** Rule 1.11(g) since has been amended so as not to include a separate definition of "matter." In the current Rules, "matter" is defined generally in the Terminology section, but is required by Rule 1.11(g) to involve "a specific party or parties."

matter. The same issue of fact involving the same parties and the same situation or conduct is the same matter. By contrast, work as a government employee in drafting, enforcing or interpreting government or agency procedures, regulations, or laws, or in briefing abstract principles of law, does not disqualify the lawyer under DR 9–101(b) from subsequent private employment involving the same regulations, procedures, or points of law; the same "matter" is not involved because there is lacking the discrete, identifiable transactions or conduct involving a particular situation and specific parties. [ (ABA Comm. on Ethics and Professional Responsibility, Formal Op. 342 at 6 (1975)) (footnotes omitted).]

2. *What is participation in a matter "personally and substantially as a public officer or employee"?*

The second essential element necessary for Bar Counsel to show a violation of Rule 1.11(a) is that the government lawyer must have participated in the government matter "personally and substantially ." The Comments to Rule 1.11 do not address personal and substantial participation, and no definition of this term is provided. No District of Columbia case interprets the meaning of personal and substantial participation in the context of a disciplinary proceeding. The regulations implementing 18 U.S.C. § 207 provide some insight on this issue, although in the distinct context of guiding interpretation of a criminal statute banning conflict of interest by government employees:

> "Substantially," means that the employee's involvement must be of significance to the matter, or form a basis for a reasonable appearance of such significance. It requires more than official responsibility, knowledge, perfunctory involvement, or involvement on an administrative or peripheral issue.

5 C.F.R. § 2637.201(d)(1). However, "the single act of approving or participation in a critical step may be substantial," if the act is of significance to the matter. *Id.*

In an opinion interpreting DR 9–101, the D.C. Bar Legal Ethics Committee opined that a government lawyer's participation in a matter was personal and substantial because it was "direct, extensive, and substantive, not peripheral, clerical, or formal." Opinion No. 84 (1980).

3. . *What is a "substantially related" matter?*

The third essential element for a violation of Rule 1.11(a) is that the matter in which the government lawyer participated must be "substantially related" to the subsequent matter in which he or she represents the private client. The methodology for determining whether two matters are "substantially related" in the revolving-door context, under DR 9–101(b), was the subject of extended analysis by the *en banc* Court in *Brown.* *Brown* concerned whether counsel for a private real estate developer should be disqualified in a Board of Zoning Adjustment proceeding where the counsel previously had been counsel for the District of Columbia in two earlier transactions relating to the same piece of real estate. 486 A.2d at 40. In *Brown,* the Court noted that the substantial relationship test originated in litigation between private parties in the context of a motion to disqualify counsel on the grounds that a lawyer had unethically switched sides between private litigants. 486 A.2d at 42. The Court cited *T.C. Theatre Corp. v. Warner Brothers Pictures, Inc.,* 113 F.Supp. 265, 268–69 (S.D.N.Y.1953), *aff'd,* 216 F.2d 920 (2d Cir.1954), a case in which the central purpose of the ethical prohibition against side-switching was described as preventing a private lawyer who may have received confidential information from using it against the client in a subsequent representation.

The Court described the test that was generally used to determine if two matters were substantially related in private side-switching cases:

> "Initially, the trial judge must make a factual reconstruction of the scope of the prior legal representation." If the factual contexts overlap, the court then has to determine "whether it is reasonable to infer that the confidential information alleg-

edly given would have been given to a lawyer representing a client in those [prior] matters." Finally, if such information apparently was available to counsel in the prior representation, the court has to determine whether it "is relevant to the issues raised in the litigation pending against the former client." If all three conditions are met, the matters will be substantially related and thus deemed the same for conflict of interest purposes, with doubts to "be resolved in favor of disqualification."

*Id.* at 49 (citations and footnotes omitted) (quoting *Westinghouse Electric Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 225 (7th Cir.1978)).

The *Brown* Court then examined the revolving-door situation, in which a lawyer leaves the government to enter private practice. The Court concluded that the revolving-door rule, like the side-switching rule, was designed to address at least a reasonable possibility that some specifically identifiable impropriety would occur. 486 A.2d at 49. The Court emphasized that the critical issue was whether the attorney had the opportunity while participating in a matter in the government to gather specific information that the attorney could not otherwise have gained and that could be used on behalf of a private client in a later proceeding. The information of concern was not general data, or general agency expertise and contacts, but specific information. *Id.* at 48–49.

The *Brown* Court concluded that the *Westinghouse* private side-switching test should be broadened in a government revolving-door case for several reasons. First, because government attorneys may have had access to more kinds of information than private attorneys typically do, there is a greater potential for misuse of government information in the revolving-door situation. Second, the public generally is more concerned about government improprieties than private improprieties, and the appearance problem is more severe because the public is likely to be more critical of the potential abuse of information by a government lawyer entering private practice. Third, the complainant in a revolving-door situation may not have specific knowledge of the information gathered by the government lawyer. *Id.* at 48.

As a result, the Court in *Brown* articulated a broad test for determining whether a substantial relationship exists between two matters in revolving-door cases:

> Accordingly, in cases where the complainant's evidence shows that the factual contexts of the two (or more) transactions overlap in such a way that a reasonable person could infer that the former government attorney may have had access to information legally relevant to, or otherwise useful in, the subsequent representation, we conclude that the complainant will have established a prima facie showing that the transactions are substantially related. The burden of producing evidence that no ethical impropriety has occurred will then shift to the former government attorney, who must rebut complainant's showing by demonstrating that he or she could not have gained access to information during the first representation that might be useful in the later representation. Absent sufficient rebuttal, the complainant will have carried the burden of persuasion as the moving party.

486 A.2d at 49–50 (footnotes omitted).

The Court in *Brown* stressed that it would not be adequate rebuttal for the former government lawyer to state that no useful information was in fact received during the government representation. The Court declared that if it was reasonable to infer that the lawyer may have received useful information during the government representation, there would be a conclusive inference that useful information was in fact received. 486 A.2d at 50. The lawyer's rebuttal case had to focus instead on the scope of the representation involved in each matter and not the actual receipt of information:

> To rebut a complainant's prima facie showing of substantial relationship, the former government attorney must produce evidence elaborating on the nature of the two matters so as to make it "clearly discernible" that the issues involved are unrelated and the court should not infer the existence of useful government-developed information.

*Id.* at 50 n. 18 (quoting *Westinghouse Electric Corp.,* 588 F.2d at 224).

The Court also made clear that it would not inquire into the specific information or confidences disclosed during the government representation, or whether that information was used by the former government lawyer in private practice. The Court noted that it would not require proof that an attorney actually had access to or received privileged information in the prior case. "Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained." *Brown,* 486 A.2d at 42 n. 5 (quoting *T.C. Theatre Corp.,* 113 F.Supp. at 268–69).

While the Court in *Brown* set out a methodology for determining when matters are substantially related that is designed to give wide scope to the protection of the public, it made clear by its exacting analysis of the facts that it would take care in applying that test to each case, so that private employment following government service would not be unduly constrained. In *Brown,* the two lawyers involved, while previously at the D.C. Office of Corporation Counsel, had worked on two transactions involving the property: the developer's attempt to increase the height limitation on the property and the developer's attempt to mix residential and commercial uses on the property. When the two lawyers left the government, they were retained by the same developer to handle another zoning issue involving the same property: the developer's application for a special zoning exception to increase the number of below-grade parking spaces permitted on the property. 486 A.2d at 40–41.

In deciding a motion to disqualify the two lawyers from representing the developer in the BZA proceeding involving the parking spaces, the Court applied the methodology described above to determine whether the matters were substantially related. The Court concluded that the lawyers could not have gained any information in the earlier proceedings that would have aided them in their subsequent representation, and therefore the matters were not substantially relat-ed. *Id.* at 53, 58–59. The Court looked beyond the surface facts that the developer and property were the same, to the issues involved in the various representations, in reaching that conclusion.

When the District of Columbia Court of Appeals adopted the Rules of Professional Conduct in 1991, it also adopted the Comments to the Rules. *See* Preface to Rules of Professional Conduct (adopting Rules *and* Comments). Comment 4 to Rule 1.11 contains an explicit description of the *Brown* methodology for analyzing the substantial relationship element of Rule 1.11(a):

> The leading case defining "substantially related" matters in the context of former government employment is *Brown v. District of Columbia Board of Zoning Adjustment,* 486 A.2d 37 (D.C.1984) (en banc). There the D.C. Court of Appeals, en banc, held that in the "revolving door" context, a showing that a reasonable person could infer that, through participation in one matter as a public officer or employee, the former government lawyer "may have had access to information legally relevant to, or otherwise useful in" a subsequent representation, is prima facie evidence that the two matters are substantially related. If this prima facie showing is made, the former government lawyer must disprove any ethical impropriety by showing that the lawyer "could not have gained access to information during the first representation that might be useful in the later representation." *Id.* at 49–50. In *Brown* the Court of Appeals announced the "substantially related" test after concluding that, under former DR 9–101(B), *see* "Revolving Door," 445 A.2d 615 (D.C.1982) (en banc) (per curiam), the term "matter" was intended to embrace all matters "substantially related" to one another—a test that originated in "side switching" litigation between private parties. *See* Rule 1.9, Comment [2]; *Brown,* 486 A.2d at 39–40 n. 1, 41–42 & n. 4. Accordingly, the words "or substantially related to" in paragraph (a) are an express statement of the judicial gloss in *Brown* interpreting "matter."

B. *Did Respondent Violate Rule 1.11(a)?*

1. *What was the "matter" involved in Respondent's service as Legal Adviser that is potentially the same, or substantially the same, as his later representation of Libya in private practice?*

The Hearing Committee considered two possible "matters" offered by Bar Counsel in which Respondent was involved while he was Legal Adviser: "1) the United States government's 1986 decision to bomb Tripoli in retaliation for Libyan terrorism; and 2) the establishment of culpability for the 1988 Pan Am 103 bombing, including the government's investigation and the ensuing litigation concerning the bombing." Hearing Committee Report at 46. The Hearing Committee concluded that Bar Counsel had not carried his burden of proving that the first of the matters was substantially related to Respondent's representation of Libya, because it was not part of the same transaction or set of transactions as the later act of terrorism, the bombing of Pan Am 103. *Id.* at 46–47, 49–50. In essence, the Hearing Committee concluded that to connect the 1986 bombing of Tripoli to the 1988 Pan Am 103 bombing, one has to infer causation and retaliation not supported by the record. Applying the *Brown* test, the Hearing Committee could not reasonably conclude that Respondent obtained specific information in connection with his assistance to State Department officials concerning the bombing of Tripoli that would be useful in his later representation of Libya. Hearing Committee Report at 49. Bar Counsel has taken no exception to that conclusion, so we do not consider the 1986 bombing of Tripoli as a potential "matter" here.

On the other hand, the Hearing Committee concluded "that Respondent did participate personally and substantially while at the State Department in the response to the Pan Am 103 bombing, including the government's investigation and the establishment of liability for it." Hearing Committee Report at 51. The Board agrees.

A particular matter may be a discrete and isolatable transaction *or set of transactions. See Brown,* 486 A.2d at 42 n. 4; *Committee for Washington's Riverfront Parks,* 451 A.2d

at 1188. While a matter may be a single particular lawsuit, it also may encompass a "claim, controversy, investigation, . . . charge [or] accusation . . ." involving a specific party or parties according to the definition provided in Rule 1.11(g). The government's investigation and the establishment of culpability for the Pan Am 103 bombing, both criminally and civilly, were such an isolatable set of transactions involving a particular act and specific parties. The act of the bombing of Pan Am 103 is a specific and discrete "situation or conduct," in the language of ABA Op. 342 at 6. A representation involving investigation is specifically contemplated in the Rules as one type of representation comprising a "matter," as long as it involves a specific party or parties, as required by Rule 1.11(g). Respondent concedes before the Board that the government's investigation of the bombing of Pan Am 103 is a "matter" within the meaning of Rule 1.11(a). Respondent's Opening Brief at 4. The parties are specific: the United States government, the victims of the bombing, Pan Am, and the perpetrators. The claim, controversy or investigation concerning who was responsible and liable for the bombing related to "the same issue of fact involving the same parties and the same situation or conduct." *Committee for Washington's Riverfront Parks,* 451 A.2d at 1188.

Respondent argues vigorously before the Board that because the perpetrators of the bombing were not known to be Libyan nationals while Respondent was Legal Adviser, he cannot be said to have participated in a matter involving Libya that is the same or substantially the same as the representation of Libya that he undertook in private practice. We disagree. A "matter" can be an "investigation" or "claim," under the definition provided in the Rules. It is inherent in the nature of an investigation or claim that all actors may not be identified during the representation. In this case, the event is discrete, and all of the other actors were known. The "matter" is not terrorism, or even Libyan terrorism. Such broad definitions of the "matter" here would be analogous to defining the "matter" in *Brown* as the property at issue, or the developer's goal of maximizing the value permitted under the

zoning laws applicable to the property. The Court rejected such a broad definition of "matter" in *Brown*, over a vigorous dissent. In contrast, the bombing of Pan Am 103 is a discrete event, and the legal activities flowing from the government's efforts to address it are an isolatable set of transactions. Put another way, the Pan Am 103 bombing was a single event that spun off into a number of legal issues and proceedings as the government investigated and attempted to impose responsibility.

Respondent urges the Board to define "the matter" here as a series of separate "matters," with each matter being one step or issue concerning his involvement in responding to the Pan Am 103 bombing as Legal Adviser. Respondent would have us treat the Civil Case subpoena, the government's investigation, and the Criminal Case each as separate matters. The Board does not believe that an investigation and the proceedings that impose responsibility can be so neatly separated. Respondent received briefings concerning the investigation of the bombing on a continuing basis so that he could provide legal advice, and he did so. He thus was knowledgeable and able to assist on the third-party subpoena matters because of that information, which he received as the top legal officer in the State Department. The third-party subpoena response in the Civil Case simply was part of the legal work called for as part of the investigation and effort to impose responsibility, as was activity involving an unnamed country's support for terrorism. The fact that Respondent's legal work involving the investigation took various forms does not diminish the fact that Respondent was available as counsel, and served as counsel, on a continuing basis concerning legal work required by the Legal Adviser to support the overall investigation and assessment of responsibility. It would be strange indeed if Rule 1.11(a) permitted a government lawyer to know the confidential course of an investigation into an act, take some responsibility for legal reaction to those events, but then turn around in private practice and represent an alleged perpetrator of those same acts.

Respondent further contends that the description of the "matter" has evolved during this proceeding, and that he was not fairly on notice that the Hearing Committee would consider the investigation and efforts to establish responsibility for the bombing overall as a "matter." The record does not square with Respondent's argument.

Bar Counsel charged that Respondent violated Rule 1.11(a) in that "he [had] accepted other employment in connection with a matter that was the same as or substantially related to one or more matters in which he participated personally and substantially as a public officer or employee, namely, the interests of the government of the United States in connection with (a) acts of Libyan terrorism directed against United States citizens, (b) the Mass Disaster Litigation [the Civil Case], and/or (c) the Criminal Case." BXB, ¶ 34, at 9–10. Bar Counsel's original formulation was not identical to the Hearing Committee's articulation, which focused on the investigation and efforts to establish responsibility for the bombing. There can be no doubt that Respondent was fully aware of the gravamen of the charges against him, however. Bar Counsel articulated a view of the matter at issue during the hearing that incorporates all of the features of the "matter" as described by the Hearing Committee. II Tr. 273–302. The main difference seems to be that Bar Counsel characterized the "investigation" as pre-indictment proceedings in the criminal case. Respondent did not raise then, or in the extensive briefing to the Hearing Committee, any claim of surprise that the investigation and overall effort to establish responsibility could be considered a "matter." In any event, the charge against Respondent never changed during the course of the proceedings. *See* Board Rule 6.3. At issue always was a single violation of Rule 1.11(a). Board Rule 6.3 certainly does not contemplate that the same words must be used throughout a proceeding to describe a Respondent's alleged misconduct.

If Respondent was substantially and personally involved in that activity, and then undertook a representation in private practice involving the same or substantially the

same matter, he violated Rule 1.11(a). We turn to those prongs of the analysis.

2. *Was Respondent personally and substantially involved in the establishment of culpability for the Pan Am 103 bombing, including the government's investigation and the subsequent litigation?*

The Hearing Committee concluded that "Respondent's involvement in this matter while in the government was personal and substantial." Hearing Committee Report at 52. We agree.

Respondent received the State Department's daily written briefing reports and occasional oral briefings about sensitive or important matters, which periodically contained information about the progress of the United States government's investigation concerning the bombing. Findings of Fact, ¶ 9. Respondent also had access to classified communications and cables relating to the progress of the investigation and diplomatic efforts concerning the bombing. *Id.* Respondent personally participated in a diplomatic exchange with a country other than Libya "occasioned by the Pan Am 103 bombing," relating to that country's responsibility for terrorist activity, which included a direct contact by Respondent with that country. Findings of Fact, ¶ 11.

Respondent personally approved the memorandum to the State Department's Director General, regarding the response to be made by the State Department to Pan Am's third-party subpoena in the Civil Case. Findings of Fact, ¶¶ 16–17. The Hearing Committee specifically found that Respondent's approval of the memorandum "was not an insignificant or ministerial act," because it was undertaken pursuant to Respondent's policy of personal review of documents from his office going to an Assistant Secretary or higher official in the State Department. Findings of Fact, ¶ 19. The Committee's finding that "Respondent's review and signing of this memorandum constituted the exercise of his discretion to approve the legal advice in the memorandum" is a finding supported by substantial evidence in the record, on which we

defer to the Hearing Committee. *Id.; see In re Micheel,* 610 A.2d 231 (D.C.1992); *In re Appler,* 669 A.2d 731 (D.C.1995).

Respondent argues that even if his participation in the response to the subpoena was personal and substantial, it was not substantial participation in the underlying Civil Case. This is important to our analysis below as to whether a matter in which Respondent had personal and substantial responsibility is substantially the same as the later private representation, because Respondent's own retainer letter referenced the pending civil case as a matter that his representation would attempt to resolve. BX 10. In addition, one of the first tasks undertaken by HH & R in the representation of Libya was obtaining the docket entries in the Civil Case (Findings of Fact, ¶ 52), and it became increasingly clear in HH & R's dealings with OFAC as the representation began that, in order to be compensated, services were to be in connection with U.S. court cases. Findings of Fact, ¶¶ 38–41.

We agree with Respondent that responding to a third-party subpoena request alone may not in every case be the equivalent of personal and substantial participation in all of the issues of the underlying litigation, particularly if the responding lawyer learns nothing about other issues in that litigation when dealing with the subpoena. But Respondent had additional involvement in issues related to the Pan Am 103 bombing while he was the Legal Adviser. He was periodically apprised of the progress of the continuing investigation to identify the perpetrators and he participated in a diplomatic exchange with a foreign country because of the Pan Am 103 bombing to convince that country to curtail its terrorist activities. Respondent attended or knew of a confidential meeting between Secretary of State James Baker, Mr. Busby of the State Department, and Thomas Plaskett, Chief Executive Officer of Pan Am concerning Pan Am's theory that the United States had some advance knowledge of bombing threats. Findings of Fact, ¶ 20. Respondent also participated in a decision about how fully to inform the State Department's representative concerning the State Depart-

ment contact with Pan Am, in preparation for his testimony about the documents. Findings of Fact, ¶ 21.

While a lawsuit certainly can be a "matter" within the meaning of Rule 1.11(a), a matter that results in a lawsuit is not necessarily limited to that litigation. Respondent's overall involvement in the government's investigation and establishment of culpability for the bombing of Pan Am 103 was personal and substantial. Respondent was much more than the passive recipient of general agency information. As chief legal officer of the State Department, Respondent was kept abreast of the progress of the investigation and the diplomatic efforts in response to the bombing precisely so that he could provide legal advice and perform legal duties concerning the bombing when called upon to do so. In fact, Respondent did perform such service, when he communicated with an unidentified country concerning its sponsorship of terrorism, sent the memorandum regarding Pan Am's third-party subpoena in the Civil Case, and approved the decision to inform the State Department's witness of the substance of the Secretary of State's meeting with the CEO of Pan Am because, in Respondent's legal judgment, it would not do any harm to State Department or United States interests. We conclude that Respondent was substantially and personally involved in representing the interests of the Department of State in the matter of the investigation of, and establishing culpability for, the bombing of Pan Am 103.

3. *Is the matter in which Respondent was personally and substantially involved while in government the same as, or substantially related to, the representation of Libya he undertook in private practice?*

*Brown* is our guide for analyzing whether Respondent's representation of Libya in private practice was the same as, or substantially related to, the investigation and establishment of culpability for the bombing of Pan Am 103, in which Respondent had personal and substantial involvement while in government. *Brown* sets out a two-part "substan-

tial relationship" test: 1) Do the factual contexts of the government and private practice matters overlap, upon reconstruction of the scope of the prior legal representation; and 2) If the factual contexts overlap, is it reasonable to infer that the government attorney may have had access to confidential information legally relevant to, or otherwise useful in, the subsequent representation? 486 A.2d at 49–50. The Court opined in *Brown* that if the answer to these two prongs is yes, the Respondent may attempt to demonstrate through evidence concerning the scope of the legal representation involved in each matter that no such information would have been received. The Court stressed that this rebuttal burden cannot be met "simply by claiming that no useful information was, in fact, received in the first matter." *Id.* at 50.

First, the factual contexts of Respondent's government representation and private representation clearly overlap. *See Brown*, 486 A.2d at 48 n. 14, 50 n. 17 ("[a] showing of overlapping factual contexts may be sufficient to create an inference that the government developed information during the first matter which could be useful in the later private matter, and thus that the two matters are substantially related"). Both concerned addressing responsibility for the same, particular event: the bombing of Pan Am 103.

Second, we conclude that a reasonable inference can be drawn that the Respondent had access to confidential information legally relevant to, or otherwise useful in, the subsequent representation. Respondent had access to confidential—even classified—information concerning the Pan Am 103 bombing. He received confidential written and oral briefings on the status of the investigation; learned of or attended a meeting about Pan Am's theory of why the United States had some notice of and potential responsibility regarding the bombing; and assisted in developing strategy in the Civil Case in response to Pan Am's third-party subpoena. Respondent acknowledges that some information he learned about the investigation into the Pan Am 103 bombing may remain confidential in both the security and ethical sense. II Tr. 47–48.

We need not speculate about how Respondent might have used what he learned while in government in his later representation of Libya, had it continued. Indeed, the Court in *Brown* counseled against an effort to identify each bit of confidential information to determine if the government matter and private practice matter are substantially related. Counsel for Respondent agreed at oral argument that the confidential information need not be identified precisely. Transcript of Oral Argument, Jan. 9, 1997 at 12–13. The Hearing Committee and the Board do not know all of the confidential information Respondent received during his government service concerning the investigation and effort to establish culpability for the Pan Am 103 bombing. Some of that information remains confidential and classified, such as the identity of the country contacted by Respondent concerning its sponsorship of terrorism, the content of written and oral briefings and classified communications and cables received by Respondent concerning the investigation, and the substance of the United States government's investigation concerning its defense against Pan Am's allegations that the United States had advance warning of the bombing. Findings of Fact, ¶¶ 9, 11, 20–21. The Court in *Brown* set out a test focusing on the overlap between matters, which is sensible so that disciplinary action or disqualification motions do not themselves become the vehicle for exposing confidential information that could jeopardize the legitimate expectations of governmental agencies or the private parties who later retain former government lawyers.

Respondent argues vigorously that what he calls the "burden shifting" aspect of *Brown* should not be applied in the disciplinary context. He points out that principles of the Due Process and Board Rule 11.4 require that Bar Counsel carry the burden of showing a violation of a disciplinary rule by clear and convincing evidence. Because Bar Counsel and the Hearing Committee have not specified what confidential information was in jeopardy of being used or disclosed, Respondent claims, the overlap in the matters involved in his government service and

private representation of Libya has not been demonstrated.

Respondent misapprehends what is prohibited by Rule 1.11(a). While protection of confidential information is one of the policies underlying the Rule, the test of the Rule imposes no burden on Bar Counsel to demonstrate what confidential information received in the government representation could be useful in the private representation. Such a requirement would make Rule 1.11(a) enforceable only at the high cost of spilling client confidences on the public record in the disciplinary proceeding. The Court instead constructed in Rule 1.11(a) a prohibition on handling overlapping matters in the government and then later in private practice. Handling such overlapping matters is itself the disciplinary violation prohibited by Rule 1.11(a). Respondent has not been required to disprove a required element of a Rule 1.11(a) violation. He has been given the opportunity to rebut Bar Counsel's proof that the two matters were "substantially related" with any proof he cares to bring forward showing that the factual contexts involved were sufficiently different that a reasonable person would conclude he did not receive confidential information in the government matter that could be useful in representing Libya in private practice.

We also have considered Respondent's argument that *Brown* arose in the context of a disqualification issue in a civil case. We conclude, however, for two reasons, that the Court intends to apply the approach set forth in *Brown* in the disciplinary context. First, the Court in *Brown* used as its overall frame of reference the parameters set by the disciplinary rule, at that time DR 9–101(B). The Court repeatedly described what private representations would violate the DR. *E.g.*, *Brown*, 486 A.2d at 39 ("This case presents the question whether two former attorneys for the District of Columbia violated DR 9–101(B)..."); *Id.* at 42 ("we implicitly concluded that, under DR 9–101(B), matters will be deemed the same if substantially related to one another"); *Id.* at 47 ("only three improprieties are addressed by DR 9–101(B)...."). Second, in Comment 4 to Rule 1.11, the Court expressly and clearly incorpo-

rated the *Brown* approach to determining whether matters are substantially related. Such case citation in the Comments to the Rules is unusual, and we conclude it means that the Court carefully considered whether the *Brown* analysis should be used in applying Rule 1.11(a), and decided that it should.

The Board has taken into account a significant respect in which the disqualification and disciplinary contexts differ. For purposes of disqualification, any doubt is to be resolved in favor of disqualification. *See Derrickson v. Derrickson*, 541 A.2d 149, 152 (D.C.1988); *Brown*, 486 A.2d at 49. Obviously, doubts here are not resolved in favor of imposition of discipline. We have held Bar Counsel to the clear and convincing proof standard, defining the elements of proof as set forth in the text of the Rule itself, guided by Comment 4 and *Brown*.

Our analysis differs from that of the Hearing Committee mainly in that we do not speculate about what confidential information learned by Respondent as Legal Adviser could be useful in the private representation of Libya. The Hearing Committee hypothesized that the information Respondent learned while Legal Adviser that implicated two countries other than Libya could be useful in attempting to argue for a lower *ex gratia* payment to families of the victims on grounds that recovery from Libya in litigation was not certain because some evidence could point to other culprits. Hearing Committee Report at 55–57. The public member of the Hearing Committee, like the Respondent in his exception filed before the Board, argues that this theory ignores Respondent's refusal to defend the conduct of Libya or the Libyan nationals indicted for the bombing as part of his representation. Respondent argues he would not, in fact, have used any information he learned while in the government to the detriment of any party in seeking a consensual resolution. He stated that he was proceeding on the assumption that Libya was responsible for the bombing. II Tr. 114.

The Board concludes that this debate is a red herring for purposes of determining whether Respondent violated Rule 1.11(a).

It is impossible to know what course Respondent's representation of Libya would have taken had it continued, and Respondent still holds in confidence information he received as Legal Adviser about the bombing. Although we, like the Hearing Committee (Hearing Committee Report at 65), credit Respondent's testimony that he intended to pursue only consensual resolutions, he was Libya's lawyer. He was not a mediator, hired by both sides to facilitate a resolution. As Respondent stated, he was not going to lobby on behalf of Libya, but he "was a lawyer doing things that a lawyer does." I Tr. 221. His ethical obligation was to reach the best result for Libya that would be acceptable to other parties. The payment that Respondent contemplated—an *ex gratia* payment, or payment made without acknowledgment of responsibility—did not preclude him from vigorously negotiating the amount of and means of paying the settlement.

Clearly the private representation was contemplated to be a very substantial matter involving how to accomplish Libya's acceptance and payment for the liability in a way that would extinguish its obligation to the families of the victims and the international community. Bar Counsel rightly points out that Respondent's contemporaneous descriptions of the representations were broad and far reaching. When Respondent was considering representing Libya, he told Mr. Gerson, who represented relatives of the victims in seeking damages from Libya, that he "may be on the other side." I Tr. 112. The retainer agreement also defined the private representation in broad terms: The representation of Libya "in connection with ongoing civil and criminal disputes and litigation relating to the destruction of Pan Am 103," "investigating facts and legal proceedings, preparing legal analyses, providing legal advice and preparing legal steps to deal with this matter," and representations not including "*substantial* activities as litigators," but "limited to activities associated with agreed upon measures, including consensual resolutions." BX 10 (emphasis added).

The Hearing Committee believed that one of the most telling pieces of evidence at the hearing was Respondent's testimony con-

cerning whether there would have been an ethical issue had he agreed to represent Libya for all purposes, including defending it in litigation. Respondent said he would not have considered such a representation, but acknowledged that it would have raised an ethical issue because:

> I felt that if I were representing Libya at least an appearance would arise that I had access to information about the two other potential culprits—if I were defending Libya, that I would have access to information about the two other culprits that might be helpful in that context.

II Tr. 113–14.

The Board agrees with this assessment. The fact that Respondent was privy to highly confidential communications as Legal Adviser about precisely the event that was at the heart of the negotiation presents the situation that Rule 1.11(a) was intended to prevent. Rule 1.11(a) is a broad prophylactic rule that does not depend on the subjective intent of a lawyer, or even what a lawyer does with the information. A lawyer cannot agree to a representation and put himself in a position where he has to shape the private representation to avoid use of information learned in the government. The Rule prevents a representation in which a lawyer *could* use confidential information learned while employed in the government. While Respondent was employed in the government, his client had a terrible and tragic problem, which resulted in legal activity on several fronts. The core of fact at the heart of each piece of legal activity is the same: why and how Pan Am 103 blew up over Lockerbie.

We do conclude that Respondent violated a Disciplinary Rule for all of these reasons, not because he undertook to represent an unpopular client. Many difficult representations that satisfy the highest ethical demands of the legal profession involve clients who have committed despicable acts. Nor do we rely on the appearance of impropriety that caused public condemnation of Respondent's private representation of Libya. While policy considerations involving the appearance of impropriety are one of several underlying rationales for the Rule, such appearances do not constitute or prove a violation.

In sum, like the Hearing Committee, we do not believe that Rule 1.11(a) allows a government lawyer to be briefed in the course of his official duties about a particular, sensitive investigation into a discrete event, so that he can provide legal advice, thereby learning important confidential information, provide substantial and personal legal assistance concerning the government's efforts, then leave the government and represent a suspect in the same investigation. We conclude that Respondent violated Rule 1.11(a).

## IV. PROPOSED SANCTION

In determining the appropriate sanction, the Court looks to the seriousness of the violation, any harm as a result of the violation, any prior disciplinary violations by Respondent, and mitigating or aggravating circumstances. *See, e.g., In re Peek,* 565 A.2d 627, 632 (D.C.1989); *In re Reback,* 513 A.2d 226, 231 (D.C.1986) (*en banc* ); *In re Knox,* 441 A.2d 265 (D.C.1982); *In re Haupt,* 422 A.2d 768, 771 (D.C.1980).

Bar Counsel urged, and the Hearing Committee agreed, that an informal admonition is appropriate here. While the offense is serious, Respondent's offense was one of omission. He failed to recognize his Rule 1.11(a) dilemma, consult the State Department, obtain an independent ethics opinion, or even have a full analysis done by his firm's ethics committee. While these steps are not required by the Rules, some additional caution at the outset could have averted this proceeding.

On the other hand, we recognize that this is a case of first impression under Rule 1.11(a). Respondent's argument that application of *Brown* in the disciplinary context results in inappropriate burden-shifting is hardly trivial, and is advanced in good faith.

Certainly no sanction harsher than an informal admonition is required to conform Respondent's future conduct to the Rules. Respondent has no prior disciplinary record, and has an exemplary 30–year legal career including service as a prosecutor, professor, federal judge, and senior State Department

official. Little or no harm was caused by Respondent's brief representation of Libya. He withdrew very early in the representation, and while his reason for withdrawing was the adverse reaction that he felt would interfere with his ability to represent Libya effectively, there was no harm to the client or any breach of confidence.

We have no comparable Rule 1.11(a) case to use as a parallel for purposes of assessing consistent discipline, but are confident that an informal admonition is appropriate.

## CONCLUSION

The Board recognizes that the application of Rule 1.11(a) is very important to the many members of our Bar who have served, or who aspire to serve, in government. The disciplinary system must protect the interest of the public by discouraging attorneys in government from shaping their practice to give unfair advantage to their later private clients, or from jeopardizing confidential information learned in government service. At the same time, government service should not be discouraged by ethical rules that prohibit government lawyers from making reasonable and appropriate use later in private practice of the expertise they have gained. The Court struck that balance in Rule 1.11(a). The Board views the application of Rule 1.11(a), and the balance struck between the policy interests served by the Rule, as fair and reasonable on the facts presented in this case.

The Board hereby directs Bar Counsel to issue an informal admonition to Respondent.

BOARD ON PROFESSIONAL RESPONSIBILITY

By: /s/ Patricia A. Brannan
        Patricia A. Brannan
        Vice–Chair

All members of the Board concur in this Order except Mr. McKay, who is recused, Ms. Zumas, who did not participate, and Mr. Banks, who files a dissenting opinion.

June 30, 1997

### DISSENTING OPINION

The Hearing Committee correctly stated that the essential elements to prove a violation of Rule 1.11(a) are:

(1) a government lawyer

(a) participates as a public employee in a matter,

(b) both personally and substantially;

(2) followed by the lawyer's leaving the government and accepting employment in another matter that is

(a) the same as or

(b) substantially related to the original matter.[1]

The Committee found that Respondent participated in two matters while in the government that are relevant here: (1) the government's decision to bomb Tripoli, and (2) "the establishment of culpability for the 1988 Pan Am 103 bombing, including the government's investigation and the ensuing litigation concerning the bombing."[2] I agree with the Committee's finding that the Tripoli bombing was sufficiently unrelated to the Pan Am bombing that Respondent's admittedly considerable involvement in the government's response to the former would not preclude him from representing a client's interests in the latter.

Respondent undertook to provide legal "advice to the Government of Libya about civil and criminal litigation relating to the Pan Am 103 disaster..."[3] Thus, the Committee's characterization of the second matter in which Respondent participated while in the government is consistent with the representation he undertook on behalf of Libya.

I part company with the Committee and the majority on the degree of Respondent's involvement in that matter while he served in the government. The record discloses that Respondent had virtually no involvement in

---

1. Hearing Committee Report at 36.

2. *Id.* at 46.

3. Specification of Charges, No. 26, admitted by Respondent.

the investigation of the Pan Am bombing. The investigation was handled by the State Department's Office on Counterterrorism and the Department of Justice.[4] Respondent was apprised of the progress of the investigation through routine, daily written briefings provided to the twenty-five top State Department officials, which covered a wide range of topics.[5] Throughout that portion of the investigation conducted while Respondent was in the State Department, the government believed, and Respondent received briefings supporting the theory, that Iran and Syria were responsible for the Pan Am bombing.[6] It was not until after the Respondent left the State Department in June of 1990 that the he learned that the government had information linking Libya to the bombing.[7]

In my view, the record does not support a finding that Respondent had either a personal or a substantial involvement in the investigation of the bombing. He merely received periodic briefings about the progress of the investigation being conducted by the Office on Counterterrorism and the Department of Justice.[8]

The record also does not support a finding that Respondent had a substantial role in the civil and criminal litigation spawned by the bombing. Again, the Department of Justice was responsible for representing the government in all such litigation. Respondent's only involvement was to initial one memorandum, prepared by an attorney in the Office of Counterterrorism and approved by the *deputy to* the head of that office, recommending State's response to a single set of subpoenas

seeking documents served on the agency by Pan Am.[9] The "responsive documents were not attached" to the memorandum Respondent initialed,[10] and Respondent testified that he considered the memorandum to be a routine response to a subpoena for documents.[11] Respondent initialed the memorandum and routed it to the State Department's Director General, who had the ultimate authority to provide the agency's response. Later, Respondent had a conversation with Mr. Morris D. Busby, the head of the Office on Counterterrorism. Respondent agreed with Mr. Busby that Mr. Busby's designated witness to testify on the events described in the responsive documents should be informed that Pan Am's Chief Executive Officer had met with the Secretary of State and Mr. Busby, and of the substance of that meeting. Respondent did not remember whether he was present at the Secretary's meeting with Pan Am, but he did remember being informed of it by Mr. Busby.[12]

Respondent's role in the agency's response to one set of subpoenas served on the State Department (concerning allegations the government considered utterly groundless), does not amount to substantial involvement in the civil and criminal cases. Those cases were handled by the Department of Justice, and substantive assistance from the State Department was lent by the Office on Counterterrorism, not Respondent.[13] The criminal case was initiated on November 13, 1991 with the indictment of two Libyans, seventeen months after Respondent's departure from State. Obviously Respondent played no role

---

4. Amicus Curiae Reply Brief at 17; H.C. Report ¶¶ 14–16 at 10–11.

5. H.C. Report, ¶ 9 at 8.

6. Sometime after the bombing, Respondent was sent to a country other than Libya to persuade it to stop its terrorist activities. *Id.,* ¶ 11 at 9. It is not apparent from the record that this diplomatic exchange was related to the Pan Am investigation.

7. *Id.,* ¶ 23 at 15–16.

8. The information Respondent received in the daily briefings concerning the investigation, directed at the culpability of Iran and Syria, would

not have afforded him an advantage settling claims against a country that was not a target of that investigation during his tenure.

9. H.C. Report, ¶ 17 at 12.

10. *Id.,* ¶ 16 at 12.

11. *Id.,* ¶ 18 at 12.

12. *Id.,* ¶ 20 at 13–14.

13. When Respondent left the government, no viable theory for the civil cases had yet been developed, for the government still believed that Iran and Syria were responsible for the bombing.

in the development of the factual bases for these indictments.

While I do not believe that Rule 1.11(a) precluded the representation, Respondent and his firm, Hughes, Hubbard & Reed, did not take the one simple step that would have significantly diminished the appearance of impropriety. It was the negative reaction of the public due to the appearance of impropriety that terminated the representation and led Bar Counsel to initiate this proceeding. At the very least, Respondent should have notified the State Department of his intention to represent Libya, and inquired as to whether State perceived a conflict with this representation. The most prominent factor that led Libya to approach Respondent is the fact that he was the Legal Adviser for the State Department at the time of the bombing. To dispel any perception that his former position would have afforded him or his putative client an unfair advantage, it was incumbent upon Respondent to consult with State before accepting the representation. It is conceivable that State would have concluded that Respondent's role in the matter was so minimal, and occurred at such an early stage in the investigation, that it would interpose no objection to the representation.[14] Indeed, Respondent's immediate successor as Legal Adviser, Edwin D. Williamson, is the author of the *Amicus Curiae* briefs opposing the application of Rule 1.11(a).[15] However, Respondent and his firm specifically rejected this option, fearing that merely making the inquiry would cause a "bombshell" that might endanger its $3.0 million retainer agreement with Libya.[16]

Libya was notorious to most Americans before the Lockerbie bombing, and the discovery of its culpability for that atrocity only exacerbated the public's hostility. Any firm that agreed to accept a sizable retainer to represent the interests of a rogue state that sponsored the murder of hundreds of innocent individuals would encounter a negative public reaction.

At oral argument before the Board, counsel for the firm insisted that the firm had crossed every "t" and dotted every "i" to resolve any ethical concerns. The firm effectuated the resignation of one of its attorneys who represented a pre-existing client seeking compensation from Libya for the bombing.[17] It also "walled off" a law clerk who had served as the Associate Coordinator in the State Department's Office on Counterterrorism in 1992–93.[18]

While the firm eliminated these two obvious conflicts, at no cost to the firm, it chose not to consult the State Department, knowing that a negative response would make the Libyan representation untenable. However, declining to consult with State left the firm defenseless to critical articles in the press. The firm issued a press release on July 12, 1993 announcing its representation of Libya. On July 14, 1993, the *Washington Post* criticized the representation in an article entitled "Indecent Proposal." In response to media inquiries concerning the firm's press release, the State Department declined to comment.[19] The next day Respondent wrote two letters to State's Legal Adviser, pressing the Department for an immediate vindication of the representation. When State declined to provide an overnight opinion, Respondent and the firm withdrew from the representation the next day, July 16, 1993.

Neither the State Department nor the Department of Justice initiated a complaint of an ethical violation against Respondent. Had Respondent consulted State in advance, and given the agency a reasonable opportunity to review his prior involvement in the

---

14. *See* Rule 1.9.

15. Mr. Williamson left the State Department sometime before Respondent agreed to represent Libya.

16. H.C. ¶ 47 at 27.

17. Libya's sovereign immunity rendered a recovery for the individual client problematic, while Libya's $3.0 million fee was deposited in advance, $250,000 to be drawn monthly, irrespective of the number of hours worked. H.C. ¶ 33 at 19–20.

18. *Id.,* ¶ 48 at 27–28.

19. *Id.,* ¶ 54 at 30.

656

matter,[20] he might have been able to proceed with the representation, and to avoid this proceeding.

/s/ Terry Michael Banks
  Terry Michael Banks

Dated: June 30, 1997

20. The Legal Adviser in July 1993 was at least the second to hold that position since Respondent left in 1990. *Id.* at 3; ¶ 56 at 31.